UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| : | |
| : | Case no. 2:10-cr-77-1 |
| v.    : | |
| : | |
| MARK VARGA, : | |
| : | |
| Defendant.   : | |

**OPINION AND ORDER**

Defendant Mark Varga is charged with conspiracy to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841 and 846. On December 20, 2010, a bench trial was held on this matter. At the close of evidence, Counsel for Mr. Varga indicated that they would submit briefing that would serve both as a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 and as their summation of the case. "[A] district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable[] to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Because the Court is acting as the trier of fact in this case, separate consideration of the Rule 29 motion is

unnecessary, and the Court will proceed to address the question of whether the Government has proven Mr. Varga's guilt of the charged offense beyond a reasonable doubt.

For the reasons set forth below, the Court finds Mr. Varga guilty of conspiracy to distribute marijuana.  However, the Government has not met its burden of proving beyond a reasonable doubt that Mr. Varga's offense involved 100 kilograms or more of marijuana.  The Court therefore finds Mr. Varga not guilty of the quantity element alleged in the indictment.

## Factual Background

On December 1, 2009, a tractor-trailer containing 851 pounds or 386 kilograms of marijuana crossed from Canada into the United States at the port of entry at Highgate Springs, Vermont.  Agents at the port of entry searched the truck and seized the marijuana, which was stored among other cargo in plastic carboys.  The agents learned that the truck was to deliver the marijuana to a warehouse in Newburyport, Massachusetts.  Later investigation revealed that the warehouse had been leased in the name of a Canadian business called Plastech Canada.  The lease was arranged by a man named Claudio Lopresti, who used a real estate agent in New Hampshire to arrange the transaction.

On the morning of December 2, 2009, law enforcement officers supervised the controlled delivery of 200 pounds of the marijuana to the warehouse.  They arrested the warehouseman, Artur Buczma.

According to the stipulations submitted by the parties, on the afternoon of December 2, 2009, Mr. Varga "traveled to the . . . warehouse for the purpose of picking up marijuana from the warehouse." Stip. ¶ 9.  He was driving a U-Haul van rented by Brenda Comeau from Leominster, Massachusetts.  The parties further stipulated that, between the time Mr. Buczma was arrested and the time Mr. Varga arrived at the warehouse, Mr. Varga telephoned Mr. Buczma twice and Mr. Buczma telephoned Mr. Varga once.  Massachusetts State Trooper Daniel Clemens testified that, before Mr. Varga arrived at the warehouse, Mr. Buczma, who had several phones with him including an encrypted Blackberry, "was receiving and sending communications, both texts and calls," Trial Tr. at 27, ECF No. 50, and "having text contact and email contact with different parties involved in the situation." Suppression Hr'g Tr. at 59-60, ECF No. 27.[1]  Trooper Clemens further testified that law enforcement officers at the scene suspected that multiple customers would be arriving at the warehouse to pick up portions of the marijuana that day:

> There was a dynamic situation where we didn't – we were unsure of when the next potential pickup would be happening. . .  [At the time Varga arrived] it was our thought that there would be more customers coming to pick up more marijuana, and we wanted to be in a

---

[1] A transcript of a hearing on Mr. Varga's motion to suppress a statement he made after his arrest was held on November 9, 2010.  The transcript was admitted into evidence at the trial.

```
                                    position where we were
          ready if [] they showed up."
```
*Id.* at 59.

Although the contents of Mr. Buczma's Blackberry were remotely erased before a forensic examination of the phone could be performed, one of the officers at the warehouse was able to photograph a text message received on the Blackberry. *See* Ex. 12. It read as follows:

```
Order #1- 48o (1) sm and some nothing
Skids 1-1o - (48 per skid)
All bottom row , 12 units out of 16
Total - 48o (1)
```

The Government posits that this message was intended to instruct Mr. Buczma that the first order to be picked up from the warehouse would be 480 pounds of marijuana, which was stored in carboys stacked on the bottom row of skids[2] numbered 1 through 10, some of which were marked with the letters "SM" and some of which were unmarked.[3]

---

[2] A "skid" is a cargo pallet.

[3] This interpretation of the message is consistent with what the agents found in the truck during the search at the port of entry. The truck contained twenty-four skids each loaded with five levels of carboys with sixteen carboys to a level. Some of the skids contained marijuana only in the bottom level of carboys, and some of the bags of marijuana hidden in the carboys were marked with the letters "SM" while other bags were unmarked. While Mr. Varga points out that it is unclear why the sender of the text message would use the lower-case letter "o" to represent the number zero in the message, he offers no alternative explanation of the message that is as plausible as the Government's interpretation, in light of its consistency with evidence discovered during the search of the truck.

Mr. Varga arrived at the warehouse at approximately 3:00 PM. He was the only individual that the law enforcement officers observed arriving at the warehouse that day. Upon entering the warehouse, Mr. Varga greeted Mr. Buczma and was immediately placed under arrest before any marijuana changed hands. Shortly after his arrest, Mr. Varga told an agent from Immigration and Customs Enforcement that "he would not roll on the big guy." *Id*. at 16.

## Discussion

The indictment in this case charges Mr. Varga with "knowingly and intentionally conspir[ing] with others to distribute marijuana" "in or about December 2009, in Franklin County, Vermont and elsewhere[.]" Indictment, ECF No. 1. It alleges that "the offense involved 100 kilograms or more of marijuana." *Id*. A conviction of this offense requires proof beyond a reasonable doubt of three elements: 1) that two or more persons entered the unlawful agreement charged in the indictment; 2) that Mr. Varga knowingly and willfully became a member of the conspiracy; and 3) that more than 100 kilograms of marijuana were involved in the offense. *See United States v. Gonzalez*, 420 F.3d 111, 125 (2d Cir. 2005). The Court will address each of these elements in turn.

1. Existence of Agreement

The existence of a conspiracy to distribute marijuana in

this case is not contested by the parties.  It is undisputed that a tractor-trailer containing 851 pounds of marijuana was driven from Canada to a rented warehouse in Newburyport, Massachusetts.  It is further undisputed that, shortly after receiving 200 pounds of the marijuana during a controlled delivery, Mr. Buczma received a text message instructing him to distribute a portion of the marijuana as "Order #1."  These facts alone show the existence of an agreement between Mr. Buczma and others to distribute marijuana.

2. Varga's Membership in the Conspiracy

In order to prove a defendant's membership in a conspiracy, the Government must generally show that he or she "knowingly and willfully was an active participant in the unlawful plan with the intention of furthering its objectives."  *United States v. Barlin*, 686 F.2d 81, 90 (2d Cir. 1982) (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980)).  Mr. Varga asserts that the evidence adduced at trial – including the stipulation that he "traveled to the . . . warehouse for the purpose of picking up marijuana from the warehouse," Stip. ¶ 9 – shows nothing more than that he was "a customer purchasing some marijuana."  Def.'s Post-trial Mem. 10, ECF No. 52.  He argues that, as a mere purchaser of marijuana, he cannot be held criminally liable for conspiracy to distribute the drug.

While it is true that, "[w]ithout more, the mere

buyer-seller relationship is insufficient to establish a conspiracy[,]" *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989)), the Second Circuit has made clear that the so-called "buyer-seller exception" is a "narrow" one. *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (citing *United States v. Hawkins*, 547 F.3d 66, 71-72 (2d Cir. 2008)).[4] In explaining the scope of the exception, the Second Circuit has commented that:

> The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy. This rationale does not apply, however, where . . . there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use. Under such circumstances, the participants in the transaction may be presumed to know that they are part of a broader conspiracy.

*United States v. Medina*, 944 F.2d 60, 65-66 (2d Cir. N.Y. 1991) (internal citations omitted); *see also United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("Purchase or sale of contraband

---

[4] The Second Circuit has explained the buyer-seller exception as follows: "[W]hile the illegal sale of narcotics is a substantive crime requiring an agreement by two or more persons, the sale agreement itself cannot be the conspiracy to distribute, for it has no separate criminal object." *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008) (internal quotation omitted).

may, of course, warrant the inference of an agreement going well beyond the particular transaction.  A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time[.]").  "The critical inquiry in each case is whether the evidence in its totality . . . [establishes] beyond a reasonable doubt that the defendant was not merely a buyer or seller of narcotics, but rather that the defendant knowingly and intentionally participated in the narcotics distribution conspiracy by agreeing to accomplish its illegal objective beyond the mere purchase or sale."  *Hawkins*, 547 F.3d at 73-74.

   The Court finds that in the instant case, the totality of the evidence proves beyond a reasonable doubt that Mr. Varga was a member of the conspiracy to distribute marijuana alleged in the indictment.  To begin with, the fact that Mr. Varga arrived at the warehouse in a U-haul van, rented earlier that day, strongly suggests that he planned on picking up a "wholesale quantit[y] of drugs [] not intended for personal use."  *Medina*, 944 F.2d at 65.  Moreover, Mr. Varga's repeated phone contact with Mr. Buczma prior to his arriving at the warehouse is indicative of "advanced planning among the alleged co-conspirators."  *Id*.  Finally, Mr. Varga's statement to law enforcement that "he would not roll on the big guy" certainly "warrant[s] the inference [that Mr. Varga was a party to] an agreement going well beyond the particular

[buy-sell] transaction." *Borelli*, 336 F.2d at 384.  If Mr. Varga's involvement with the conspiracy was in fact limited to a single purchase of a small amount of marijuana, it seems improbable that the idea of "roll[ing] on the big guy" would even have occurred to him.  In sum, the totality of the evidence in this case is inconsistent with Mr. Varga being a mere buyer of a small quantity of marijuana and wholly consistent with the Government's assertion that he was "aware of [and] agreed to participate in [the] larger conspiracy" to distribute marijuana.  *Medina*, 944 F.2d at 65.[5]

### 3. Quantity of Marijuana Attributable to Mr. Varga

In order to hold a conspiracy defendant criminally liable for a particular quantity of drugs, the Government generally must prove that "drug type and quantity were at least reasonably

---

[5] While Mr. Varga points to some evidence that suggests his role in the conspiracy was less than that of other co-conspirators – namely, that he was not found in possession of a Blackberry, that "there is no evidence that he had anything to do with any text messages[,]" and that "there [is no] evidence that he had anything to do with importing the marijuana or with renting or running the warehouse," Def.'s Post-trial Mem. 9 – this does not eliminate his liability as a member of the conspiracy.  "Even the most rudimentary models reveal that a narcotics conspiracy . . . depends for its success on the employment of a number of persons, each of whom, while appreciating the scope of the overall business venture, performs a separate assigned task and does not necessarily know or work directly with all of the other participants." *United States v. Santana*, 1974 U.S. App. LEXIS 7151, 12-13 (2d Cir. 1974) (citations omitted).  "One need not participate in each act of a conspiracy in order to be a part of it." *Id*.  "A single act may suffice, if that act is one from which knowledge of the general conspiracy can be inferred." *Id*.

foreseeable to the co-conspirator defendant." *United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006) (citing *United States v. Martinez*, 987 F.2d 920, 926 (2d Cir. 1993)). However, in *United States v. Andino*, the Second Circuit held that "[u]nder 21 U.S.C. § 846, the Government need not prove foreseeability of drug type and quantity to the extent that it seeks to hold a defendant accountable for drug transactions in which the defendant directly and personally took part." 627 F.3d 41, 47 (2d Cir. 2010). Accordingly, the question in this case is whether Mr. Varga directly and personally took part in a transaction involving 100 kilograms or more of marijuana and, if not, whether that quantity was reasonably foreseeable to him.

In *Andino*, a package containing cocaine addressed to the defendant was intercepted by customs officials, who then conducted a controlled delivery. A woman at the address said she knew Andino and accepted the package for him. Andino then picked the package up and delivered it, unopened, to another building. Andino claimed that he believed that the package contained marijuana, not cocaine. The court found that the Government was not required to prove that drug type and quantity were reasonably foreseeable to Andino because he "directly and personally took part in the drug transaction" "as indicated by the uncontroverted evidence (a) that the incriminating package bore his name; (b) that he physically possessed the package after it arrived at the

listed address; and (c) that he transported the package to a neighboring building, where his co-conspirators later picked it up." *Id*. In *United States v. Chalarca*, by contrast, the Second Circuit found that the Government did have to prove reasonable foreseeability of drug quantity where the district court found that the defendant, who had accompanied his cousin to the site of a drug transaction and handled a bag of money, "had no knowledge of what was taking place there" and "did not constructively . . . or actually possess" the drugs because the arrests were made before any drugs changed hands.  95 F.3d 239, 244 (2d Cir. 1996).

   Mr. Varga argues that, based upon cases such as *Chalarca* and *Andino*, the Court cannot find that he was directly and personally involved in a drug transaction on December 2, 2009, because he never actually or constructively possessed any of the marijuana. While Mr. Varga is correct that actual or constructive possession plays a significant role in the analysis of whether a defendant was directly and personally involved in a drug transaction,[6] he

---

[6] *See, e.g.*, United *States v. Abdulle*, 564 F.3d 119 (2d Cir. 2009) (reasonable foreseeability need not be proved where defendant was arrested in car delivering khat to distribution center); *United States v. Morgan*, 385 F.3d 196 (2d Cir. 2004) (reasonable foreseeability need not be proved where defendant personally transported ecstacy pills); *Adams*, 448 F.3d 492 (reasonable foreseeability must be proved where defendant recruited another to transport drugs on his behalf); *United States v. Santos*, 541 F.3d 63 (2d Cir. 2008) (reasonable foreseeability must be proved where defendant committed murders in furtherance of conspiracy but wasn't present for any drug

is incorrect in concluding that actual or constructive possession is a dispositive factor. Notably, in *Chalarca*, the court relied not just on the lack of actual or constructive possession in coming to the conclusion that the Government was required to show reasonable foreseeability, but also on the district court's factual finding that the defendant "was not aware that the purpose of his trip to the scene was to purchase cocaine." 95 F.3d at 244. That direct and personal involvement is not coterminous with the concepts of actual and constructive possession is also apparent from the Tenth Circuit's opinion in *United States v. Lockhart*, 37 F.3d 1451 (10th Cir. 1994). In that case, the court found that the defendant "personally participated" in a drug transaction, thereby obviating the need for the Government to show reasonable foreseeability, because he "drove the car . . . to facilitate the transaction" and because he "knew the purpose of the trip was to obtain cocaine." *Id.* at 1454.[7]

---

transactions). *United States v. Martinez*, 987 F.2d 920 (2d Cir. 1993).

[7] While Mr. Varga asserts that Lockhart was also in constructive possession of the cocaine, and that this fact may therefore have factored into the court's finding that he had personally participated in the transaction, *see* Def.'s Post-trial Mem. 7 n.3, this is far from clear. The opinion indicates that Lockart drove his co-conspirator to a restaurant and then waited in the car while the co-conspirator went inside to obtain the drugs. Both Lockhart and his co-conspirator were arrested "as [the co-conspirator] returned to the car." 37 F.3d at 1451. The Court did not explicitly address the question of whether Lockhart

Taken together, *Chalarca* and *Lockhart* make clear that actual or constructive possession are not the only factors to be considered in determining whether a defendant was directly and personally involved in a drug transaction. Rather, these cases indicate that a defendant's presence at the scene where a transaction is to take place and his awareness of the purpose of going to that location are also important factors. In the instant case, it is undisputed that Mr. Varga was present at the location where the drug transaction was to take place and that he "traveled [there] . . . for the purpose of picking up marijuana[.]" Stip. ¶ 9. Accordingly, even though Mr. Varga was arrested before he took possession of any contraband, the Court finds that he was directly and personally involved in a transaction to purchase marijuana and that the Government need not prove reasonable foreseeability to hold him accountable for the amount of marijuana involved in that transaction.

This raises the question of what quantity of marijuana was in fact involved in the transaction in which Mr. Varga participated. The Government argues that because Mr. Varga was the first customer to arrive at the warehouse that day, because

---

was ever in constructive possession of the cocaine. Moreover, in explaining its finding that Lockhart personally participated in the transaction, the Court did explicitly identify two factors – his driving of the car to facilitate the transaction and his awareness of the purpose of the trip – without mentioning the potential factor of constructive possession.

he was the only person to call Mr. Buczma's phone "throughout that day," and because he arrived in a van large enough to carry 480 pounds of marijuana,[8] there is no question that he was there to pick up Order #1.  See Govt's Post-trial Mem. 7-11, ECF No. 51.  While the Government's assertion that Order #1 was for 480 pounds of marijuana is consistent with what law enforcement agents uncovered during the search of the truck at the port of entry, see supra, the Court finds that the evidence adduced at trial does not prove beyond a reasonable doubt that Mr. Varga was there to pick up that particular order.

In particular, Trooper Clemens's testimony that, while he was at the warehouse, he observed Mr. Buczma "having text contact and email contact with different parties involved in the situation"[9] and that the officers on the scene suspected that multiple customers would be arriving at the warehouse to pick up portions of the marijuana that day creates reasonable doubt that Mr. Varga was in fact there to pick up Order #1.  There is more than a remote possibility that Mr. Varga was the first and only customer to arrive at the warehouse that day because other customers, including the one who was to pick up Order #1, were

---

[8] The parties stipulated that the rental van Mr. Varga drove to the warehouse that day was large enough to hold 480 pounds of marijuana.

[9] Unlike the text message regarding Order #1, the contents of these other communications were not introduced into evidence at trial.

late and/or decided not to enter the warehouse because they were alerted to the presence of law enforcement.  Furthermore, while it is undisputed that Mr. Varga's rental van was large enough to pick up 480 pounds of marijuana, it could also have been used to carry some smaller load.

For similar reasons, the Court is also unable to conclude that the Government has proved beyond a reasonable doubt that a quantity of 100 kilograms or more of marijuana was reasonably foreseeable to Mr. Varga.  While the Government is correct that the circumstances surrounding Mr. Varga's arrival at the warehouse – including the size of the rental van and his statement that he would not "roll on the big guy" – suggest that he was there to pick up a wholesale quantity of marijuana, that quantity could just as easily have weighed less than 100 kilograms (still a sizeable quantity) as 100 kilograms or more.

"[D]rug quantity [is] an element [which must] be pleaded and proved beyond a reasonable doubt in every prosecution seeking conviction on an aggravated § 841 offense."  *Gonzalez*, 420 F.3d at 125 (citing *United States v. Thomas*, 274 F.3d 655, 663 (2d Cir. 2001)).  In this case, the Government has not proved the quantity element alleged in the indictment beyond a reasonable doubt because it has not shown either that the transaction in which Mr. Varga directly and personally took part involved 100

kilograms or more of marijuana or that this amount of marijuana was reasonably foreseeable to him.

## Conclusion

Because the evidence adduced at trial does not establish beyond a reasonable doubt that Mr. Varga was directly and personally involved in a transaction involving 100 kilograms or more of marijuana, or that this quantity of marijuana was reasonably foreseeable to him, the Government has failed to sustain its burden on the quantity element of the offense alleged in the indictment.[10]  The Court finds Mr. Varga **not guilty** of the offense of conspiracy to distribute 100 kilograms or more of marijuana.  Nonetheless, the Government has proved beyond a reasonable doubt that Mr. Varga knowingly and willfully became a member of the conspiracy to distribute marijuana alleged in the indictment.  Accordingly, the Court finds Mr. Varga **guilty** of the lesser included offense of conspiracy to distribute marijuana.

Dated at Burlington, in the District of Vermont, this 15th day of February, 2011.

/s/ William K. Sessions III
U.S. District Court Judge

---

[10] Of course, at sentencing, the Government may attempt to show that a preponderance of the evidence establishes that Mr. Varga should be held accountable under the Federal Sentencing Guidelines for the quantity of 480 pounds.